[Civ. No. 19951. Second Dist., Div. One. July 7, 1954.]

JAMES B. COCHRAN, Appellant, v. EARLE
ELLSWORTH, Respondent.

Demler & Eckert and Elizabeth Cochran for Appellant.

Best, Best & Krieger and Joseph A. Ball for Respondent.

MOSK, J. pro tem.*—Desiring to sell his real property, consisting of 480 acres, the entire town of Stanfield, Arizona, respondent, Earle Ellsworth in January, 1950, listed the property with Hapeman-McDonald, real estate brokers, in Riverside, California. Shortly thereafter appellant, a real estate broker licensed in California, but not in Arizona, learned of the listing, advertised the property and made efforts to obtain a purchaser.

On March 5, 1950, respondent informed appellant that the agency of Hapeman-McDonald was being revoked but that appellant could continue his efforts to sell the property. About this time appellant interested one Charles Fitzgerald, a Long Beach medical doctor, in the property and on March 4, 1950,

Dr. Fitzgerald and his wife inspected the property unaccompanied by appellant.

Within a few days thereafter, on or about March 8, 1950, respondent Dr. Fitzgerald and appellant met in the Fitzgerald home in Long Beach, California, and negotiated for the sale of the Arizona property. Pursuant to these negotiations escrow instructions were drafted by the Farmers and Merchants Bank of Long Beach. On March 14, 1950, appellant went to Arizona where he further conferred with respondent, who advised him that he desired to have his own attorney in Arizona prepare the escrow instructions. The attorney, Eugene K. Mangum, drafted new instructions and at the same time, pursuant to a request from appellant, prepared a separate memorandum by the terms of which appellant was to receive a broker's commission in the total sum of $8,200.

The latter agreement, executed by both respondent and appellant, provided in part as follows:

"Whereas, party of the second part has acted as broker in arranging for the sale of certain Arizona property owned by party of the first part and others, and

"Whereas, it is desired by this Agreement to establish the terms of payment of the commission for such services performed by party of the second part,

"Now, Therefore, it is mutually agreed:

I.

"In the event of consummation of the sale of the property hereinabove referred to, party of second part is to be entitled to a commission in the amount of Eighty-two Hundred ($8200.00) Dollars, payable as follows: The sum of $1200.00 at the close of escrow, and the sum of $7,000.00 on or before November 15, 1950."

The parties concede that the escrow instructions constituted a binding contract of purchase and sale of the property. The escrow was thereafter opened in the Farmers and Merchants Bank in Long Beach. The buyer, Dr. Fitzgerald, deposited in the escrow a deed to his Long Beach home, $10,000 in cash and his promissory note secured by a deed of trust on the Arizona property. He also paid the sum of $4,000 cash outside of escrow for the stock of goods in the store located in Stanfield. For this he received a bill of sale from the respondent. On or about April 15, 1950, Dr. Fitzgerald took possession of the Arizona property. Subsequent thereto, at some time undisclosed by the record, respondent met all conditions required of him by the escrow.

The escrow was never closed for on June 1, 1950, Dr. Fitzgerald served a notice of rescission upon respondent, claiming fraudulent misrepresentations concerning the property had been made to him. Respondent promptly instituted an action for specific performance against Dr. Fitzgerald in the court of Pinal County, Arizona.

This action was never brought to trial, for Fitzgerald and respondent, after negotiations through their attorneys, mutually rescinded the transaction and instructed the escrow holder to return the monies, deeds and other papers to the parties who had deposited same.

Not having received his commission, appellant brought this action for the purpose of collection. The trial court found that respondent made no false representations to Dr. Fitzgerald but that the latter desired "to get out of the bargain from his own choice." The trial court also found that the brokerage contract was executed in Arizona, that appellant was not a licensed real estate broker under the laws of the state of Arizona and that under those laws a broker cannot recover a commission upon a broker's contract unless so licensed. The court further found that it was the intention of the parties that the commission would be payable only if Dr. Fitzgerald completed the transaction of purchase, and that since he did not, no commission was due. From that determination, the broker has appealed.

In their settled statement, the parties have agreed there are two questions to be resolved on appeal: (1) when the owner of real property located in Arizona comes into California and lists such property with a California broker, does the fact that the written memorandum of his promise to pay broker's commission was signed in Arizona preclude the broker from collecting his fee; and (2) under the evidence was the sale of the real property involved "consummated," so as to entitle the broker to his commission under a contract which called for payment of commission upon "consummation" of sale?

1. *Does lack of an Arizona license prevent recovery by appellant?*

The first query of the parties on this appeal poses a perplexing problem involving the validity of the broker's contract, he having been licensed in California but not in Arizona. Both California and Arizona have a statute of frauds requirement that real estate brokers' contracts, to be enforce-

able, must be in writing. But beyond that, whether we here apply Arizona or California law is a unique dilemma in the conflicts of laws field. The following factual capsule will demonstrate the difficulty: there was one transaction; the property was in Arizona; the broker was in California; the seller was in Arizona; the buyer in California; the seller gave oral authorization to the broker in California; the written brokerage contract was executed in Arizona; the broker's services were rendered in California; the purchaser was obtained in California; the sale was negotiated in California; the escrow instructions were prepared in California but revised in Arizona; the escrow instructions were signed by the seller in Arizona but by the purchaser in California; the escrow was opened in California.

In many jurisdictions it has been held that an isolated transaction does not preclude recovery of a commission by a nonresident unlicensed real estate broker where he is not shown to be otherwise carrying on the business of a real estate broker in the state. (*Ressler* v. *Marks,* 308 Pa. 205 [162 A. 666, 86 A.L.R. 638] ; *Boggan* v. *Clark,* 141 Miss. 849 [105 So. 760] ; *Land Co. of Florida* v. *Fetty,* 15 F.2d 942; *Vossler* v. *Earle,* 273 Ill. 367 [112 N.E. 687].) However, the laws of Arizona specifically provide that "the performance of one act . . . shall constitute the performer thereof a real estate broker" (Arizona, Laws 1937, ch. 53, p. 177). If appellant is otherwise subject to the laws of Arizona by virtue of his contract, he is not exempt because only a single transaction was involved.

Three possible rules have been suggested for ascertaining the law governing the validity of a contract: (1) the intention of the parties; (2) the place of performance; (3) the place of making the contract. These are discussed at length by Beale in 23 Harvard Law Review 260 ff., and he concludes (p. 272) that "the principle which is both sound theoretically and most practical in operation is the principle that contracts are in every case governed as to their nature and validity by the law of the place where they are made."

The place of making the contract, and its equivalent, the place of contracting, properly mean the place in which the final act was done which made the promise or promises binding. Just what event is the final one necessary to make a contract is primarily a question to be determined by the law of contracts. (2 Beale, *The Conflict of Laws,* page 1045.) In contract law, the universal principle disposing of this, says Williston (vol. I, p. 309), is "that the place of the contract

is the place where the last act necessary to the completion of the contract was done,—that is, where the contract first creates a legal obligation." To the same effect is *Fitzhugh* v. *University Realty Co.*, 46 Cal.App. 198, 199 [188 P. 1023]. An example is this situation described in *Michelin Tire Co.* v. *Coleman & Bentel Co.*, 179 Cal. 598, at 604 [178 P. 507]: "The contract in question was prepared in Los Angeles, signed by the defendant company there and forwarded to the Michelin Tire Company of New Jersey at Milltown for acceptance. It contained a provision that it should not be binding until accepted by the Michelin Tire Company. Upon receipt of the contract at Milltown the Michelin Tire Company, after making a *substantial* change in one of the provisions of the contract, signed the same and returned it to the defendant company with advices as to the change. Until this change had been approved it was not the contract between the parties. The defendant company upon receipt of the contract as modified, by letter dated November 5, 1908, and mailed from Los Angeles, advised the Michelin Tire Company that it accepted the contract as modified. Under the authorities the contract was clearly executed in California where the last act in its execution was performed. (*Ivey* v. *Kern County Land Co.*, 115 Cal. 196 [46 P. 926]; *Bank of Yolo* v. *Sperry Flour Co.*, 141 Cal. 314 [74 P. 855, 65 L.R.A. 90].)"

Ordinarily the "last act essential to the validity" of a brokerage contract is not the signing of authorization to act. The mere engagement of a broker to dispose of specified property does not create an enforceable contract, for the broker is not obligated to find a purchaser. An enforceable contract does not result until the broker finds one able and willing to buy the property at the authorized price. The validity of such a contract is to be determined by the law of the state where the contract was consummated, that is, the place where the purchaser was found. (Vol. 11, California Jurisprudence 2d, page 153.) This is not inconsistent with the rule that the *lex loci contractus* determines the validity and legal effect of a contract; it is merely a method of ascertaining the *loci contractus*.

An exception to the rule, however, is discussed in 159 American Law Reports 267:

"It is well settled, expressly or by necessary implication, by practically all the cases in which the courts have had the occasion to consider the question, that real-estate brokerage

contracts authorizing or employing the broker to sell or buy real estate do not involve any transfer of an interest in land within the contemplation of the rule that contracts relating to a transfer of an interest in land are governed by the law of the jurisdiction where the land is located; and that such brokerage contracts are in the category of contracts of employment for personal services, which, under the general rule relating to the governing law of contracts, are governed by the law of the place where they are made and are to be performed, and that, if they are to be performed at a place other than where they are made, then by the law of the place where they are to be performed—and not by the law of the situs of the property as such.'' To the same general effect is *Manhattan Life Ins. Co.* v. *Johnson,* 188 N.Y. 108, 113 [80 N.E. 658, 660, 11 Ann.Cas. 223, 9 L.R.A.N.S. 1142].

There are some cogent reasons for not paying blind obeisance to the authority of the place of contracting in this day when ease of transportation and communication virtually erase state boundaries as commercial limitations. The *lex loci contractus* rule is not universally recognized and has been criticized in that it frequently elevates fortuitous and insignificant circumstances to crucial importance in establishing the controlling law. As stated in 31 California Law Review 95, 96, ''In a society in which business is characteristically transacted while traveling, over the telephone, through the mails and telegraph, the place of acceptance may be in a state unrelated to previous negotiations or subsequent performance—a place involved solely because one party is passing through it. It seems strange to give the law of that place great weight.''

In *Johnson* v. *Allen,* 108 Utah 148 [158 P.2d 134], the court held a contract was not invalid where it did not have to be performed in a state in which the broker was not licensed. The fact that some of the negotiations were conducted in the state in which the broker was unlicensed is not controlling, held the court in *Foley* v. *Hassey,* 55 Wyo. 24 [95 P.2d 85]. Also see *Tillman* v. *Gibson,* 44 Ga.App. 440 [161 S.E. 630].

Failure to rigidly adhere to the *lex loci contractus* creates problems, it is true. Yet by considering the facts in each case individually, courts have found a way to render substantial justice. In *O'Dea* v. *Throm,* 250 Ill.App. 577, conversations between seller and broker took place in Illinois, but a confirming written communication, posted in Illinois, was received by the broker while in Florida, situs of the real

property. The court held Illinois law to prevail. In *Howell* v. *North,* 93 Neb. 505 [140 N.W. 779], the seller and broker dealt with each other in Nebraska, the property and ultimate sale were both in Colorado. The court held (p. 780) the law of Colorado, "the place where the act was to be performed," was controlling. In *Aronson* v. *Carobine,* 129 Misc. 800 [222 N.Y.S. 721], with an agreement made in New York to sell property located in New Jersey by a broker unlicensed in New Jersey, the court held the contract valid on the ground it was for personal services and these were rendered in New York. Restatement Conflict of Laws, § 347, puts it this way: ". . . a promise may be legal although the acts called for would be illegal if to be performed in the state where the contract was made. . . . Illustrations:

"1. The purchase of grain futures is forbidden by the law of X but is legal by the law of Y. A agrees with B in X to purchase grain futures in Y. The bargain is legal."

Back of many of these cases is the desire of the courts to see that a broker is compensated for services actually rendered pursuant to agreement. As stated in *Howell* v. *North,* 93 Neb. 505 [140 N.W. 779, 780] : "The purpose of the statute was to protect landowners from the fictitious claims of real estate dealers who actually never sold the land they claimed to sell and never earned the commissions for which they were claimants; but it was never the intention of the Legislature to protect the real estate owner against legitimate claims for services which he authorized in writing, and which were honestly rendered."

Therefore courts will frown upon efforts to avoid payment of a just claim merely because an agreement was signed in a place requiring a license. The court curtly disposed of such contention in *Peters* v. *Andrews,* 74 Ind.App. 578 [129 N.E. 328, 329] : "We do not need to cite authority to support us in deciding that a resident of Mattoon, Ill, who engages the services of a resident of Knox county, Ind., to sell his farm in such county, cannot avoid paying for such services by going into a city where it is unlawful to engage in the real estate brokerage business without a license, to execute his contract of sale with the purchaser by his agent, and his agreement to pay such agent for his services."

In the instant case we have a contract for personal services, most of which the parties well knew had already been performed in California, and the balance of which they contemplated to be performed in California. In this situation

the bare physical act of signing the written instrument was a fortuitous, fleeting and relatively insignificant circumstance in the total contractual relationship between the parties. It should not be elevated to paramount importance, particularly when to do so will serve only the purpose of rendering invalid an otherwise legal agreement. Nor do we overlook the fact that the party here challenging the contract is the one who, through his own attorney, prepared the instrument and supervised its execution. Where a doubt exists, a contract is to be interpreted most strongly against the party responsible for the uncertainty. (Civ. Code, § 1654.) A contract is to receive such interpretation as will make it lawful and operative if reasonably possible. (Civ. Code, § 1643.)

Therefore we are governed in this case by California, not Arizona law. Since plaintiff was duly licensed as a broker in California, where his services were performed, the agreement was not void.

2. *Was the sale "consummated" as contemplated by the agreement?*

■ Generally speaking, a real estate broker has earned his commission when he has brought to the vendor a purchaser who is ready, willing and able to buy the property upon the terms on which the agent is authorized to sell, or when a written contract upon any terms acceptable to the seller has been entered into with a purchaser originally brought to the vendor by the agent. (*Alison* v. *Chapman,* 36 Cal.App. 759 [173 P. 389].) It is not necessary for the sale to be completed, under the foregoing rule, for the broker to be entitled to his commission. (*Carlin* v. *Lifur,* 2 Cal.App. 590 [84 P. 292].) ■ Or if the owner makes concessions to the purchaser, it may not result in loss to the broker without his consent. (*Backman* v. *Guadalupe Realty Co.,* 78 Cal.App. 347, 352 [248 P. 296].) A broker who has rendered all required services is not to be denied compensation therefor by the whims of a defaulting vendor or purchaser who arbitrarily refuses to perform under a sales contract.

■ In the instant case, if the parties had entered into the usual type of real estate brokerage contract, the respondent would have been liable despite the subsequent termination of the sales agreement. Although the trial court found the vendor had made no false representations justifying the purchaser's attempted rescission, nevertheless the vendor and purchaser agreed between themselves on the terms of a rescission. Thus it appears that the vendor, upon no compulsion

of court order, voluntarily yielded to what the trier of fact here has determined to be an unjustified demand. By so doing he could not, under a standard broker's contract, deprive the broker of the fruits of his labor. (*Lesser* v. *W. B. McGerry & Co.*, 121 Cal.App. 193, 197 [8 P.2d 1058]; *California Auto Court Assn.* v. *Cohn*, 98 Cal.App.2d 145, 149 [219 P.2d 511].) Some cases have excused a seller from liability to the broker after a rescission if the seller acted in good faith. (*Leventritt* v. *Cowell*, 21 Cal.App. 597, 601 [132 P. 627]; *Dunne* v. *Colomb*, 192 Cal. 740 [221 P. 912]; *Prince* v. *Selby Smelting & Lead Co.*, 35 Cal.App. 684 [170 P. 1075].) It is not an act of good faith, however, to collusively agree with a buyer to terminate the purchase contract, or to acquiesce in wrongful insistence upon rescission. The binding written promises of a contract, upon which a third person relies for compensation earned, may not be so casually reduced to mere illusory texture.

But here we have no form brokerage contract. The instant agreement, specially prepared after negotiation, provided "in the event of consummation of the sale" a commission was to be paid, the first payment to be "at the close of escrow." Therefore two events, unless they should occur simultaneously, had to come to pass before liability was to arise.

■ An owner and broker may, if they wish, enter into a binding agreement that no commission shall be considered earned until the happening of a certain specified event (*Edgecomb* v. *Callahan*, 132 Cal.App.248 [22 P.2d 521]), or upon certain defined terms and conditions (*Backman* v. *Guadalupe Realty Co., supra*), or upon any named contingency (*Denbo* v. *Weston Investment Co.*, 112 Cal.App.2d 153, 157 [245 P.2d 650]). ■ When a condition precedent is adopted by the parties to a contract, the court will exact a substantial if not strict observance of the provisions before finding liability. (*Peterson* v. *Montgomery Holding Co.*, 89 Cal.App.2d 890, 894 [202 P.2d 365].)

The event upon which the first payment was conditioned never occurred as the escrow was not closed, a situation parallel to that in *Wilson* v. *Security-First Nat. Bank*, 84 Cal.App.2d 427 [190 P.2d 975]. Appellant does not clear that hurdle by maintaining that the "close of escrow" provision relates not to a condition precedent, but merely to the time of payment. For that time has not come to pass, and thus the whole sum sued for is not due.

More important here, however, is the proper construction

to be accorded the phrase "in the event of consummation of the sale." Upon insistence of appellant that the phrase was ambiguous, and over opposition of respondent whose position in this regard we believe was sound, the trial court permitted parol evidence of the negotiations of the parties leading to the execution of the written instrument. The court's finding was "that there had been discussion between the parties about the prospective purchaser and whether he would go through with the transaction, and the court finds that it was the intention of the parties that the commission would be payable if Dr. Fitzgerald completed the transaction of purchase. . . ."

When parol evidence is admitted as an aid to construction, upon appeal the trial court's construction of the instrument is ordinarily conclusive if the extrinsic evidence is conflicting, and the determination is supported by the evidence, as it is in this case (*Woodbine* v. *Van Horn*, 29 Cal.2d 95, 104 [173 P.2d 17].)

Without regard to the extrinsic evidence, however, the words "consummation of the sale" have a reasonably well defined meaning under the law. First of all, they refer to a future event, not to an obligation immediately arising upon execution of the instrument here in question. *Alison* v. *Chapman, supra.* Secondly, the cases clearly hold that "consummation of the sale" means completion of the transaction, and where real property is involved, payment of the purchase price and conveyance of title. (*Peak* v. *Jurgens,* 5 Cal. App.2d 573 [43 P.2d 569].) The word "consummate" means "to bring to completion." (*McGill* v. *Fleming,* 32 Cal. App.2d 601 [90 P.2d 341]; *Connor* v. *Riggins,* 21 Cal.App. 756 [132 P. 849].)

Where a broker has seen fit to allow payment of his compensation to be contingent upon performance of a contract between parties other than himself, he cannot complain if, through the nonperformance of that contract, his own contingent rights be lost. If the broker suffers any hardship from that result, it is unfortunately inherent in the form of his contract, which was the only written means he chose for his protection. (*Lawrence Block Co.* v. *Palson,* 123 Cal. App.2d 300, 307 [266 P.2d 856].)

The sale could have been completed only upon payment of the purchase price, delivery of deeds conveying title and close of escrow. Those events did not transpire and therefore the sale was not consummated within the provisions of the agreement. We do not mean to hold, however, that after con-

summation of the sale a rescission with the consent of an innocent vendor who voluntarily chooses not to hold a defaulting purchaser would relieve an obligation to pay for a broker's services. Clearly that would be unjust to the broker. But here we have the rescission taking place prior to consummation of the transaction, and with the broker's compensation contingent upon consummation, liability did not arise.

The judgment is affirmed.

White, P. J., and Drapeau, J., concurred.

A petition for a rehearing was denied August 4, 1954, and the following opinion was then rendered:

THE COURT.—On petition for rehearing, appellant urges that the transaction was consummated because title passed in escrow, even though a deed was not delivered to the purchaser. It is true that title may pass in escrow when all of the conditions of the escrow have been performed and the grantee is entitled to possession of the deed. (*Holman* v. *Toten,* 54 Cal. App.2d 309 [122 P.2d 808]; *Hagge* v. *Drew,* 27 Cal.2d 368, 375 [165 P.2d 461]; *Blumenthal* v. *Liebman,* 109 Cal.App.2d 374, 379 [240 P.2d 699].) But in this instance two circumstances indicate close of escrow was essential to consummation of the transaction: first, the finding of the trial court that the commission was to be payable if the purchaser "completed the transaction of purchase" and the escrow was a significant phase of the "transaction of purchase"; and second, the first portion of the commission was not payable until "close of escrow."

We therefore add to the first sentence of the final paragraph of our typewritten opinion the words "and close of escrow", so that lines 7 and 8, page 17 [126 Cal.App.2d 440, lines 41, 42] will now read: "The sale could have been completed only upon payment of the purchase price, delivery of deeds conveying title and close of escrow." With the opinion so amended, the petition for rehearing is denied.